**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF OHIO
WESTERN DIVISION**

Danielle Nickolas, : Case No. 4:10CV205

   Plaintiff, :

v. :

Commissioner of Social Security, : **MAGISTRATE'S REPORT AND RECOMMENDATION**

   Defendant. :

Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of Defendant's final determination denying her claim for disability insurance benefits (DIB) under Title II of the Social Security Act (Act) and for Supplemental Security Income (SSI) under Title XVI of the Act. Pending are the parties' briefs on the merits (Docket Nos. 12 and 13). For the reasons that follow, the Magistrate recommends that the Court affirm the Commissioner's decision.

**I**. **PROCEDURAL BACKGROUND**

On February 15, 2008, Plaintiff filed applications for a period of disability, DIB and SSI alleging disability beginning January 1, 2008 (Docket No 11, Exhibit 6, pp. 2-4 of 27, 10 -13 of 27). Plaintiff's requests for SSI and DIB benefits were denied initially and upon reconsideration. On August 11, 2009, Administrative Law Judge (ALJ) Wayne Stanley held an administrative hearing at which Plaintiff,

represented by counsel, and Vocational Expert (VE) Karen Krull appeared and testified (Docket 11, Exhibit 3, p. 2 of 35).  The ALJ rendered an unfavorable decision on August 27, 2009 (Docket No. 11, Exhibit 4, pp. 6 -20 of 20).  The Appeals Council denied Plaintiff's request for review on August 3, 2009 (Docket No. 11, Exhibit 2, pp. 2 - 4 of 29).  Plaintiff filed a timely action seeking judicial review of the Commissioner's final decision.

## II.  JURISDICTION

This Court exercises jurisdiction over the Commissioner's final decision pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *See McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832 -833 (6th Cir. 2006).

## III.  FACTUAL BACKGROUND

**A.    PLAINTIFF'S TESTIMONY.**

At sixteen years of age, Plaintiff was diagnosed with fibromyalgia, a condition characterized by long term body pain and tender points, and Raynaud's Syndrome, a condition causing discoloration primarily in the fingers and toes.  The symptoms of fibromyalgia include  muscle "attacks" that last a minimum of thirty minutes.  The attacks were characterized by tingling muscles, weakness and numbness (Docket No. 11, Exhibit 3, pp. 9-10,  16 of 35).  The symptoms of Raynaud's Syndrome included an intolerance for cold.  When her hands and feet turned pale or dark purple, it was painful. She compared her persistent pain to taking an ice cube and putting it in hot water (Docket No. 11, Exhibit 3, pp. 15, 16 of 35).

At the time of the hearing, Plaintiff was 30 years of age, 5'7" tall and weighed 169 pounds.  She had obtained an associate's degree in video production and film making.  Plaintiff was single with no source of income.  She lived with a roommate who was employed.  She was able to drive.  Plaintiff ambulated with the assistance of a cane (Docket No. 11, Exhibit 3, pp., 19 of 35).  Plaintiff was dyslexic

(Docket No. 11, Exhibit 3, p. 20 of 35).

During the year preceding the hearing, Plaintiff had lost 40 pounds and undergone a cholecystectomy and partial hysterectomy.  She attributed the weight loss to the effect that thyroid medication had on her metabolism.  Plaintiff had a hysterectomy to relieve, in part, the effects of abdominal pain, cervical strain and endometriosis.  Plaintiff was undergoing treatment for continued stomach pain (Docket No. 11, Exhibit 3, p. 16 , 17 of 35).

Throughout the years, Plaintiff was diagnosed with severe depression, post traumatic stress syndrome and obsessive compulsive disorder.  At the time of hearing, she was undergoing mental health treatment by a counselor and psychiatrist at Turning Point, a counseling service (Docket No. 11, Exhibit 3, pp. 17 of 35, 18 of 35).  Plaintiff's mental limitations included loss of memory, anxiety attacks and lack of concentration (Docket No. 11, Exhibit 3, pp. 24 -29 of 35).  Plaintiff claimed that she had panic attacks two to three times weekly and she cried three times daily.  The episodic crying was a symptom of post traumatic stress syndrome (Docket No. 11, Exhibit 3, pp. 27-28 of 35).

In 1997 and 1998, Plaintiff had a number of short-term jobs including a video editor, coffee hostess and print technician (Docket No. 11, Exhibit 3, pp. 13, 14 of 35).  Plaintiff was employed at Sears® from 2004 to 2008.  The head and neck injuries which she incurred while working there had developed gradually into arthritis.  Plaintiff had no health insurance however,  Sears® paid for physical therapy (Docket No. 11, Exhibit 3, pp. 8, 9, 14, 15 of 35).

In addition, Plaintiff was employed as a cashier at Once Upon a Child® and a telemarketer for Verizon Wireless (Docket No. 11, Exhibit 3, pp. 14 and 15 of 35).  Plaintiff was employed at Staples on a part time basis from August 2008 to March 2009.  She typically worked fifteen to twenty hours weekly.  In July 2009, Plaintiff was employed at Home Depot® as a cashier.  She worked approximately

25 hours weekly. She was admonished by Home Depot® personnel for poor and slow performance (Docket No. 11, Exhibit 3, pp. 11-12 of 35).

Plaintiff was prescribed Fentanyl, Vicodin, Klonopin, Soma and Amitriptyline. Fentanyl, a narcotic painkiller, was prescribed in the form of a transdermal patch. Soma, a muscle relaxant, was used to treat back spasms, and Amitriptyline, an antidepressant, was prescribed to treat the symptoms of depression (Docket No. 11, Exhibit 3, pp. 18 -19 of 35).

During a typical day, Plaintiff needed assistance getting out of bed and into the shower. She did not cook, vacuum or lift. She did dust. Plaintiff watched television and occasionally attended a religious study class at church (Docket No. 11, Exhibit 3, p. 19, 21 of 35).

Focusing on work related functional limitations, Plaintiff estimated that she could sit for approximately twenty minutes or longer until she experienced leg pain that radiated to her thighs and hips. It generally took ten minutes for the pain to become intolerable and she had to move. She could sit on her couch for approximately 45 minutes but she could not sit in her recliner (Docket No. 11, Exhibit 3, pp. 21 -22 of 35). Plaintiff could walk about fifteen minutes until she lost her balance and her legs started to get "wobbly." This occurred two to three times weekly (Docket No. 11, Exhibit 3, Exhibit 22 of 35).

Plaintiff estimated that she could "do a full time job at Home Depot" for six hours daily. Plaintiff claimed that she had lack of strength in her arms and hands; consequently, she could not lift anything more than ten to fifteen pounds or she would drop it. She could not tolerate cold temperatures (Docket No. 11, Exhibit 3, p. 23 of 35).

**B.  VE TESTIMONY.**

4

The VE described Plaintiff's past work of a salesperson/cashier as light, low end of semiskilled labor. The job of video editor and telemarketer were considered sedentary and skilled labor.

A claimant of Plaintiff's age, education and past work experience with a physical ability to: (1) lift twenty pounds occasionally, (2) lift ten pounds frequently, (3) stand and walk about six hours in an eight hour workday, (4) sit about six hours in an eight hour workday, (5) push and pull limited to twenty pounds, (6) climb ramps and stairs frequently, (7) stoop, kneel, crouch and crawl occasionally, (8) avoid even moderate extremes of cold temperatures; (9) and a mental impairment that included a (a) mild impairment in the ability to maintain attention, concentration, persistence and pace, (b) mild limitation in the ability to perform routine tasks; and (c) mild to moderate limitation in the ability to withstand stress and pressures of the day-to-day work activities, could perform all of Plaintiff's past relevant work (Docket No. 11, Exhibit 3, pp. 21-32 of 35).

The hypothetical claimant could not return to Plaintiff's past relevant work or any other work if he or she had an **extreme** limitation in: (1) understanding, remembering and carry out complex instructions, (2) making judgments on complex, work related decisions, (3) responding appropriately to usual work situations and to changes in routine work settings, and **marked** limitations in the ability to (1) make judgment on simple, work-related decisions, (2) interact appropriately with the public, (3) make judgment on simple, work related decisions, (4) interact appropriately with the public, (5) interact appropriately with supervisors and (6) interact appropriately with co-workers (Docket No. 11, Exhibit 3, pp. 32-33 of 35).

If a hypothetical claimant were limited to working six hours in an eight hour work day, such individual could not return to Plaintiff's past relevant work. This hypothetical claimant, however, could perform only part-time work (Docket No. 11, Exhibit 3, p. 34 of 35).

### IV. SUMMARY OF MEDICAL EVIDENCE.

Plaintiff suffered an industrial accident in January 2007. While working in the electronics department at Sears®, Plaintiff was under a 42" liquid crystal display television set. When getting up, Plaintiff hit her head on the bottom of the metal shelf which housed the television. Plaintiff developed a headache, was dazed and felt faint (Docket No. 11, Exhibit 9, p. 13 of 38). The computed tomography (CT) Scan of Plaintiff's brain was administered when she complained of worsening headaches. The results from the scan were unremarkable (Docket No. 11, Exhibit 12, p. 10 of 40).

Plaintiff was in constant pain. From January 7, 2007 through May 18, 2009, Plaintiff appeared monthly at the Doctor's Pain Clinic "for renewal of prescriptions." Plaintiff's consumption of narcotics was monitored and an "opioid agreement" was reviewed during each visit. There was no evidence of noncompliance with the terms of the agreement (Docket No. 11, Exhibit 11, pp. 2 -33 of 41; Exhibit 12, pp. 15 -27 of 40).

Dr. Jagdish H. Patel treated Plaintiff for a headache on February 7, 2007 (Docket No. 11, Exhibit 9, p. 10 of 38). Plaintiff underwent pain management therapy during February and March 2007 (Docket No. 9, pp. 5-9 of 38).

On February 15, 2007, Plaintiff's cervical pain responded well to the application of the transcutaneous electrical nerve stimulation unit (TENS), a stimulating pulse that blocks the pain signals. She reported fewer spasms overall in the cervical region as a result of such treatment. However, a headache persisted. Plaintiff received a hot pack to the cervical spine on February 23, 2007 (Docket No. 11, Exhibit 9, pp. 3-4 of 38).

On March 13, 2007, Plaintiff was treated for a severe headache on the right extending behind her right eye. The headache was relieved with treatment (Docket No. 11, Exhibit 9, p. 2 of 38).

In April 2007, Plaintiff underwent a CT scan of the head. No evidence of acute intracranial

injury was detected (Docket No. 11, Exhibit 11, p. 34 of 41).

On May 28, 2007, Dr. Paul B. Bartos, M.D., performed an independent medical examination after which he concluded that Plaintiff's ongoing treatment was due more to her condition of fibromyalgia rather than her soft tissue injury resulting from an industrial accident. Dr. Bartos further opined that Plaintiff was able to return to her former position without restrictions. It was his opinion that other than following the treatment prescribed by her pain management physician, no further treatment was necessary or appropriate as a result of Plaintiff's allowed condition (Docket No. 11, Exhibit 9,

p. 13-16 of 38).

On March 13, 2008, Dr. Linda Hall, M.D., conducted an evaluation and agreed with a residual functional capacity (RFC) for light work, provided Plaintiff refrain from even moderate exposure to the cold. No manipulative limitations were needed as difficulty using her hands was related directly to the exposure to the cold (Docket No. 11, Exhibit 9, p. 19 of 38). Dr. Hall opined that Plaintiff was limited to: (1) occasionally lifting and/or carrying twenty pounds, (2) frequently lifting and /or carrying ten pounds, (3) standing and/or walking about six hours in an eight hour workday, (4) sitting about six hours in an eight hour workday, (5) pushing and pulling on an unlimited basis, (6) not climbing on a ladder/rope/ scaffold, (7) occasionally stooping, kneeling, crouching or crawling, (8) frequently climbing a ramp/stairs, and (9) always avoiding even moderate exposure to extreme cold (Docket No. 11, Exhibit 9, pp. 21-25 of 38).

On April 7, 2008, John J. Brescia, a psychologist, determined that Plaintiff, on that date, was exhibiting low average cognitive functioning. Plaintiff did not acknowledge feelings of depression or worry. Plaintiff had learned how to offset anxiety attacks with breathing exercises. At that time, she was not undergoing therapy for mental health reasons. Mr. Brescia diagnosed Plaintiff with an anxiety

disorder, not otherwise specified, and moderate symptoms or moderate difficulty in social, occupational, or school functioning (Docket No. 11, Exhibit 9, pp. 35-36 of 38).

On April 18, 2008, Dr. John Waddell, Ph. D., a psychologist, conducted a psychiatric review technique and determined, too, that Plaintiff had an anxiety disorder, not otherwise specified (Docket No. 11, Exhibit 10, p. 7 of 19).  Plaintiff had mild functional limitations, specifically, a mild degree of limitation in restriction on activities of daily living, maintaining social functioning and maintaining concentration, persistence or pace (Docket No. 11, Exhibit 10, p. 12 of 19).

On September 16, 2008, Plaintiff was evaluated for etiology of abdominal pain, vomiting and elevated liver function test results (Docket No. 11, Exhibit 12, pp. 38-40 of 40).  Plaintiff underwent an upper endoscopy with a biopsy on October 15, 2008, to rule out the presence of infection.  The results from the upper endoscopy showed evidence of severe reflux and severe delayed gastric emptying with a large volume of retained secretions.  The results of the biopsy were normal (Docket No. 11, Exhibit 12, pp. 34-36 of 40; Exhibit 12, p. 18 of 40).  Plaintiff underwent a colonoscopy on October 29, 2008.  The results were unremarkable (Docket No. 11, Exhibit 12, p. 33 of 40).

Plaintiff was treated by Dr. Richard Kalapos from January 24, 2008, through April 15, 2009.  During the course of treatment, Dr. Kalapos provided treatment for abdominal pain and lower back pain, Dr. Kalapos suspected radiculopathy. Consequently, on March 20, 2009, Plaintiff underwent magnetic resonance imaging (MRI) to confirm its presence.  There was evidence of minimal multilevel degenerative disc disease and a normal upper thyroid (Docket No. 11, Exhibit 12, p. 11 of 40; Docket No. 11, Exhibit 13, pp. 3-7 of 32).

On January 16, 2009, Plaintiff underwent a cholecystectomy (Docket No. 11, Exhibit 13, pp. 9-10 of 32).  Dr. Kalapos reported on February 11, 2009, that Plaintiff was recuperating nicely (Docket No. 11, Exhibit 13, p. 8 of 32).

On July 22, 2009, Dr. Brian Sullivan, a psychiatrist, summarized Plaintiff's ability to do work-related activities within the parameters of her mental impairment. Dr. Sullivan noted that Plaintiff's levels of anxiety increased when dealing with people and the chronic pain caused severe depression. It was his opinion that Plaintiff had no useful ability to: (1) understand and remember complex instructions, (2) execute those instructions, (3) make judgments on complex work-related decisions and (4) respond appropriately to usual work situations. Further, Plaintiff had serious limitations in her ability to make judgments on simple work-related decisions, and interact with the public, supervisors or co-workers (Docket No. 11, Exhibit 14, p. 26 of 29).

On July 29, 2009, Plaintiff was diagnosed with a mood disorder, not otherwise specified, and post traumatic stress syndrome (Docket No. 11, Exhibit 14, p. 24 of 29).

## V. STANDARD OF DISABILITY

DIB and SSI are available only for those who have a "disability." *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); *See also* 20 C.F.R. § 416.920). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C.F.R. § 416.905(a) (same definition used in the SSI context)).

The Commissioner's regulations governing the evaluation of disability for DIB and SSI are identical for purposes of this case, and are found at 20 C.F.R. § 404.1520, and 20 C.F.R. § 416.920 respectively. To assist clarity, the remainder of this Report and Recommendation references only the DIB regulations, except where otherwise necessary.

To determine disability under Sections 404.1520 and 416.920, a plaintiff must first demonstrate

that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (*citing Abbott v. Sullivan,* 905 F.2d 918, 923 (6th Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. *Id.* A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled. *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001)(internal citations omitted) (second alteration in original)). If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates. *Id.* (*citing* 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4)).

**VII. THE COMMISSIONER'S FINDINGS.**

After consideration of the entire record, the ALJ made the following findings of facts:

1. Plaintiff met the insured status requirement of the Act through December 31, 2013.

2. Plaintiff had not engaged in substantial gainful activity since January 1, 2008, the alleged onset date.

3. Plaintiff had severe impairments, namely, back and neck disorders, chronic pain syndrome, fibromyalgia, Raynaud's Syndrome, depression, post-traumatic stress and obsessive compulsive disorder.

4. Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C. F. R. Part 404, Subpart P, Appendix 1.

5. Plaintiff had the RFC to perform light work except that she could frequently climb ramps and stairs, but would be unable to climb ladders, ropes or scaffolds. Plaintiff could occasionally stoop, kneel, crouch and crawl but she should avoid even moderate exposure to extremes of cold temperature. Plaintiff had a mild impairment in her ability to maintain attention, concentration and pace and perform routine tasks, and a mild to moderate impairment in her ability to withstand the stress and pressures associated with the day-to-day activities.

6. Plaintiff was capable of performing past relevant work as a salesclerk, a cashier, video editor and telemarketer. This work did not require the performance of work-related activities precluded by the claimant's RFC.

7. Plaintiff had not been under a disability as defined in the Act since January 1, 2008.

(Docket No. 11, Exhibit 4, pp. 11-20 of 20).

## VII.  STANDARD OF REVIEW

The district court must affirm the Commissioner's conclusions unless the Commissioner failed to apply the correct legal standard or made findings of fact that are unsupported by substantial evidence. *McClanahan, supra*, 474 F.3d 830 at 833 (*citing Branham v. Gardner,* 383 F.2d 614, 626-627 (6th Cir. 1967)). In fact the Commissioner's findings as to any fact shall be conclusive if supported by substantial evidence. *Id.* (*citing* 42 U.S.C. § 405(g )). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (*citing Besaw v. Secretary of Health and Human Services,* 966 F.2d 1028, 1030 (6th Cir. 1992)). "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. . . . This is so because there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *Id.* (*citing Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir. 2001) (citations omitted)).

Therefore the reviewing court may not try the case *de novo*, nor resolve conflicts in the evidence, nor decide questions of credibility. *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286 (6th Cir. 1994) (*citing Brainard v. Secretary of Health and Human Services*, 889 F. 2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F. 2d 383, 387 (6th Cir. 1984)).

### VIII. THE POSITIONS OF THE PARTIES

Plaintiff seeks an order of final judgment in her favor for the reasons that the treating psychiatrist's opinions show deterioration of her condition and the ALJ summarily ignored the opinions of her treating psychiatrist because they were contradicted by three non-treating sources–Dr. Bartos, Dr. Hall and Mr. Brescia.

Defendant contends that substantial evidence supports the ALJ's evaluation of Dr. Sullivan's opinions.

### IX. ANALYSIS.

The medical opinion of treating physicians should be given greater weight than those of physicians hired by the Commissioner. *Keefer v. Astrue,* 2010 WL 3222057, *6 (N. D. Ohio 2010) (*citing Lashley v. Secretary of Health and Human Services,* 708 F.2d 1048 (6th Cir. 1983)). Medical opinions are statements about the nature and severity of a patient's impairments, including symptoms, diagnosis, prognosis, what a patient can still do despite impairments, and a patient's physical or mental restrictions. *Id.* (*citing* 20 C.F.R. § 404.1527(a)(2)). However, attributing greater weight to a treating physician is required only when the treating physician's opinion is based on sufficient objective medical data and is not contradicted by other evidence in the record. *Id.* (*citing* 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3)*; Jones v. Secretary of Health and Human Services,* 945 F.2d 1365, 1370 & n. 7 (6th Cir. 1991); *Sizemore v. Secretary of Health and Human Services,* 865 F.2d 709, 711-12 (6th Cir. 1988)). Where there is insufficient objective data supporting the treating physician's opinion and there is no

explanation of a nexus between the conclusion of disability and physical findings, the fact finder may choose to disregard the treating physician's opinion. *Id.* (*citing Landsaw v. Secretary of Health and Human Services,* 803 F.2d 211, 212 (6th Cir. 1986)). The fact finder must, however, articulate a reason for not according the opinions of a treating physician controlling weight. *Id.* (*citing Shelman v. Heckler,* 821 F.2d 316 (6th Cir. 1987)).

Even when a treating physician's opinion is found not to be entitled to controlling weight, it is still entitled to deference. *Id.* A finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. *Id.* at *7. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. *Id.* In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight. *Id.* (*citing* SSR 96-2p, 1996 WL 374188, at *4). When the adjudicator determines that the treating source's opinion is not entitled to controlling weight, he or she is required to articulate good reasons for the weight given to the treating source's medical opinion. *Id.* (*citing* 20 C.F.R. §§ 404.1527(d) (2) and 416.927).

The ALJ did not summarily dismiss Dr. Sullivan's opinions. Instead, the ALJ determined that Dr. Sullivan was a treating physician and he relied upon his diagnoses. Inherent in this finding is an assumption that Dr. Sullivan's opinions were supported by objective medical evidence. However, the ALJ sufficiently and adequately articulated his reasons for failing to give controlling weight to these opinions. First, Dr. Sullivan's rating of the severity of Plaintiff's impairments is inconsistent with the subjective rating of Plaintiff's social, occupational and psychological functioning. Second, Plaintiff's testimony regarding activities of daily living and history of part-time work contradict Dr. Sullivan's

13

opinions. Third, Dr. Sullivan's opinions were inconsistent with the consultative examiner–Mr. Brescia–whose opinions were consistent with Plaintiff's testimony on limitations of activities of daily living. Fourth, following his examination, Dr. Bartos determined that Plaintiff could return to work without restriction. This finding is consistent with Plaintiff's testimony that she could "do a full time job at Home Depot" for six hours daily (Docket No. 11, Exhibit 4, pp. 18-19 of 20).

Because Dr. Sullivan's opinions lack supportability and are inconsistent with the record as a whole, the ALJ appropriately chose to attribute less weight to his opinions.

Plaintiff "takes issue" with the weight given to the opinions of Drs. Bartos and Hall and Mr. Brescia, consultative examiners.

It is well established that the opinions of non-examining state agency medical and psychological consultants have some value and can, under some circumstances, be given significant weight. 20 C. F. R. § 404.1527(d)(1), 416.927(d)(1) (Thomson Reuters 2011). State agency medical and psychological consultants are regarded as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act. POLICY INTERPRETATION RULING TITLES II AND XVI: CONSIDERATION OF ADMINISTRATIVE FINDINGS OF FACT BY STATE AGENCY MEDICAL AND PSYCHOLOGICAL CONSULTANTS AND OTHER PROGRAM PHYSICIANS AND PSYCHOLOGISTS AT THE ADMINISTRATIVE LAW JUDGE AND APPEALS COUNCIL LEVELS OF ADMINISTRATIVE REVIEW; MEDICAL EQUIVALENCE, SSR 96-6p, 1996 WL 374180, *1 (July 2, 1996). Their opinions are weighed under the same factors as treating physicians' opinions including supportability, consistency and specialization under 20 C.F.R. §§ 404.1527(d), (f), 416.927(d), (f).

The ALJ acknowledged that Mr. Brescia conducted a one-time evaluation; however, the findings of Mr. Brescia were given considerable weight because of such factors as supportability and consistency. When the record was considered as a whole, Mr. Brescia's opinions were eligible for

considerable weight (Docket No. 11, Exhibit 4, pp. 16 , 18 of 20). Similarly, the ALJ attributed equal weight to the findings of Dr. Bartos. Dr. Bartos, too, examined Plaintiff once. His findings of Plaintiff's limitations of activities of daily living were consistent with Plaintiff's testimony regarding activities of daily living and the record as a whole (Docket No. 11, Exhibit 4, pp. 15, 18 of 20). To the extent that Dr. Hall's opinions were evaluated consistent with 20 C. F. R. §§ 404.1527(d), (f) and 416.927(d), the ALJ found that she was an expert on evaluating medical claims, that her opinions were supported by the record and her opinions were consistent with the record as a whole (Docket No. 11, Exhibit 4, p. 19 of 20).

The ALJ in this case did not provide a consolidated discussion of his treatment of each non-examining source; nevertheless he considered the rules for weighing and considering opinion evidence dictated by 20 C. F. R. §§ 404.1527(d), (f) and 416.927(d), (f) throughout his opinion. The ALJ did not fail to apply the correct legal standard.

Finally, Plaintiff takes issue with the ALJ's failure to consider that Dr. Sullivan's evaluation was material because it demonstrated that her condition was progressively deteriorating. It is not clear that the presented medical evidence would have supported this conclusion since Dr. Sullivan diagnosed Plaintiff with a mood disorder and post traumatic stress disorder. All other mental evaluations show a diagnosis of an anxiety disorder. Even if Dr. Sullivan's diagnoses are relevant, there is no evidence that demonstrates the point in time that the disability began or that the disorders, previously non-disabling conditions, subsequently deteriorated. Dr. Sullivan's evaluation in 2009 does not show a deterioration in her condition sufficient to authorize an award of benefits.

## X.  CONCLUSION

For the foregoing reasons, the Magistrate recommends that the Court affirm the Commissioner's decision and terminate the referral to the Magistrate.

                          /s/Vernelis K. Armstrong
                          United States Magistrate Judge

Dated: January 31, 2011

### XI. NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.   Okaym